UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOSHUA HEISS,

               Petitioner,                     Case No. 1:10-cv-465

v.                                    Honorable Robert Holmes Bell

MARY BERGHUIS,

               Respondent.

_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Kent County Circuit Court, Petitioner was convicted of two counts of first-degree criminal sexual conduct (CSC I) involving personal injury, MICH. COMP. LAWS § 750.520b(1)(f), and one count of assault with intent to commit great bodily harm less than nurder (GBH), MICH. COMP. LAWS § 750.84. On June 4, 2007, the court sentenced Petitioner to two prison terms of 12 to 25 years for the CSC I convictions and one term of 5 to 10 years for the GBH conviction. In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

    I.     THE PROSECUTOR NOTIFIED THE COURT AND THE DEFENSE THAT IT MIGHT SEEK TO ADD AN ALTERNATIVE COUNT OF ASSAULT WITH INTENT TO COMMIT GREAT BODILY HARM AT THE CONCLUSION OF THE PROOFS. THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THIS ADDED COUNT 3 TO GO TO THE JURY AS A SEPARATE COUNT. THE TRIAL COURT AND THE PROSECUTOR DENIED MR[.] HEISS HIS RIGHT TO NOTICE AND THUS DENIED MR. HEISS HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW. HEISS IS ENTITLED TO A REVERSAL.

II.   THE TRIAL COURT DELIVERED EXTENSIVE, EXTEMPORANEOUS JURY INSTRUCTIONS.  THESE INSTRUCTIONS CONVEYED THE CLEAR MESSAGE THAT THE JUDGE HAD DETERMINED MR. HEISS TO BE GUILTY.  THESE INSTRUCTIONS ERRONEOUSLY TOLD THE JURY THAT MR. HEISS' DEFENSE WAS NOT A DEFENSE.  THE TRIAL COURT DENIED MR. HEISS HIS RIGHT TO A NEUTRAL JUDGE AND TO A PROPERLY INSTRUCTED JURY.  THE CONVICTION MUST BE REVERSED.

III.   APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO BE CONVICTED OF FIRST DEGREE CRIMINAL SEXUAL CONDUCT ONLY ON THE BASIS OF LEGALLY SUFFICIENT EVIDENCE WHERE THE PROSECUTION FAILED TO ESTABLISH THE ELEMENT OF FORCE OR COERCION.

IV.   THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL DID NOT HAVE ENOUGH TIME TO PREPARE[.] COUNSEL DID NOT CALL ANY WITNESSES OR PRESENT AVAILABLE DEFENSE EVIDENCE.

V.   APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS TO A FAIR TRIAL WHERE THE PROSECUTION MADE HARMFUL PREJUDICIAL ERROR PERSUADING THE JURY IN AN OPENING STATEMENT ABOUT HIS KEY WITNESS MS. HAWKINS.

(Pet., docket #1-3, Page ID ##26, 29, 36-38.)  Respondent has filed an answer to the petition (docket #5) stating that the grounds should be denied because they are both procedurally defaulted and lack merit.  Upon review and applying the AEDPA standards, the Court concludes that all of Petitioner's claims are meritless.  Accordingly, the petition will be denied.

**<u>Procedural History</u>**

A.   **Trial Court Proceedings**

The state prosecution arose from an interaction between Petitioner and the mother of his child on April 24, 2006, during which Petitioner engaged in oral and vaginal penetration and inflicted significant injuries on the victim.  Petitioner was charged with two counts of CSC I, and

- 2 -

he was bound over on both counts on September 14, 2006, after he waived his preliminary examination.  (*See* Cir. Ct. Register of Action, docket #7.)  Petitioner was tried before a jury beginning April 23, 2007, and concluding on April 26, 2007.[1]

Prior to jury selection, the trial court heard and decided two motions filed by the defense.  In the first motion, defense counsel moved to exclude the expert testimony of Jennifer Marcum, a domestic violence expert.  Defense counsel represented that, at a hearing on April 13, the then-presiding judge had found that the expert's testimony was relevant and admissible.  The judge also had denied defense counsel's request for additional time to find an expert witness for the defense.  Defense counsel argued that, in the absence of a report from the expert, he was unable to know what a defense expert needed to counter.  (Tr. I at 4-5.)  Counsel renewed his request to exclude the testimony of the prosecution's expert, or, in the alternative, sought a four-week continuance of the trial.  The prosecutor responded that the expert would testify only to the characteristics of battered-woman syndrome, to explain why someone who has experienced a history of violence might change her story.  The expert would not testify about the specifics of the underlying case.  The court denied the defense motion because the substance of the testimony was limited and was fully disclosed as early as January 2007.  (*Id.* at 6-8.)  Defense counsel next sought a remand to the district court for a preliminary hearing on the proposed suplemental charge of GBH.  The prosecutor responded that he had given notice as early as January 12, 2007 that he would file an amended information to include the charge of GBH, if the proofs at trial supported that charge.

---

[1]Trial transcripts are hereafter designated as follows:
Transcript for April 23, 2007 (docket #11):  "Tr. I at ____";
Transcript for April 24, 2007 (docket #12):  "Tr. II at ____";
Transcript for April 25, 2007 (docket #13):  "Tr. III at ____"; and
Transcript for April 26, 2007 (docket #14):  "Tr. IV at ____."

The court held that, under Michigan law, because Petitioner had waived his preliminary examination, jurisdiction properly was with the circuit court for all purposes, including additional charges.  The court also held that Petitioner had ample notice of the charges.  (*Id.* at 9-13.)

Dr. Stuart Allen Malafa testified that he had been an emergency room physician for 20 years, seeing an average of 6,700 patients each year.  (Tr. II at 71-72.)  On August 25, 2006, he was working at the United Memorial Hospital in Greenville, Michigan.  He dictated a medical record of his treatment of Kristee Lee Hawkins (K. Hawkins) on that date at 2:00 a.m.  (*Id.* at 73-75.)  Malafa testified that K. Hawkins sought treatment for bruises sustained that evening.  In the course of seeking treatment, Hawkins told Malafa that, after she left a bar and was driving away, her ex-boyfriend jumped through the window and forced her to drive to 14 Mile and Edgerton, where she was physically assaulted, sexually assaulted and choked.  She eventually convinced her boyfriend to allow her to go home.  (*Id.* at 76-77.)  Hawkins had multiple bruises to her right, upper facial area and bruises on her chest, particularly and excessively on her left chest area.  (*Id.* at 77.)  Malafa did not perform a sexual assault examination, because the county relies upon the rape crisis intervention team of the YWCA for such examinations.  Malafa testified that he would have referred Hawkins to the YWCA for examination or would have called social services.  (*Id.* at 78.)  From his medical records, Malafa saw no indication that Hawkins was obviously intoxicated.  He noted that she was alert, oriented, conversive, and otherwise appropriate.  He testified that he would have made a note of any impairment caused by intoxication – symptoms with which he was very familiar.  (*Id.* at 79, 83.)

Kent County Sheriff's Department employee Stacy Albers testified as the member of the Scientific Support Unit who photographed Hawkins' injuries on the afternoon of August 25,

2006.  Albers identified the photographs she took, which reflected bruises on the face, including a significant bruise around the nose and others around the eye and chin.  Other photographs showed injury to the inner tissue of the mouth, significant bruising in the upper left chest area and bruising in the right chest area, scratches and pinch-bruises on the victim's upper left arm, a significant bruise on the forearm, and bruising and scratches on the hand.  (*Id.* at 89-96.)

Dr. Matthew Dewis testified that he had been an emergency room physician for 16 years and had seen thousands of patients.  He was working in the emergency room at United Memorial Hospital in Greenville on August 25, 2006, at about 6:00 or 7:00 p.m.  Hawkins had been treated at the hospital early in the morning, after which she went to the YWCA for a sexual assault evaluation.  Hawkins told Dewis that she also had been photographed by the authorities.  She had returned to the emergency room because she had a headache and neck pain, as well as bleeding in her eyes. (*Id.* at 103-04.)  Hawkins testified that hemorrhages in both eyes typically were associated with pressure, trauma, or choking to the patient's head or neck.  (*Id.* at 105.)

Kristee'Kee Lynn Hawkins testified that Petitioner was the father of her child.  She had been his boyfriend for five years.  On August 24, 2006, K. Hawkins, Petitioner and K. Hawkins' friend Kelli and Kelli's boyfriend had gone to see a comedy show at the Crazy Horse Saloon.  (*Id.* at 110-12.)  Over one to two hours, K. Hawkins drank beer and tequila.  (*Id.* at 112.)  They decided to leave at 10:00 or 11:00 p.m., and the four drove toward another bar in Howard City.  (*Id.* at 113-14.)  On the way there, they were pulled over by the police.  All were given breathalyzer tests and told they could not drive.  The police officer drove them to a gas station.  They called Kelli's friend, Cassie, to come back and pick them up.  (*Id.* at 114.)  Cassie dropped Bill at his car and dropped K. Hawkins at hers.  Then K. Hawkins, Kelli and Petitioner drove back to the Crazy Horse.  (*Id.* at 115.)

When K. Hawkins got out of her car at the Crazy Horse, she told Petitioner that she did not want to drive him home at that time because they had just been pulled over and told that they should not be driving. (*Id.* at 115.) Petitioner got out of the car and started arguing with K. Hawkins about driving him home.  They got back in the car and there was a physical altercation during which she dropped her keys.  K. Hawkins testified that she could not remember the exact events, though she was pretty sure that Petitioner hit her.  At some point, she went back into the bar and called the police.  (*Id.* at 115-16.) As she was calling the police, Petitioner came in, and K. Hawkins hung up on the 911 call. K. Hawkins returned to the car, picked her keys up from the ground and started her car.  (*Id.* at 117-18.)  She tried to roll up her windows and close her doors so that she could leave.  (*Id.* at 118.)  She drove away quickly, but Petitioner grabbed onto the side of the car, and she dragged him 20 or 30 feet, before he managed to get into the car.  She stopped the car and tried to get out her driver's door, but her locks did not work properly.  (*Id.* at 121-22.)  Petitioner got control of the vehicle and they left the parking lot of the Crazy Horse.  They argued and fought, and Petitioner drove quite recklessly.  K. Hawkins was frightened, and she offered to give him oral sex to calm him down, which was a pattern in their relationship.  (*Id.* at 122.)  K. Hawkins was concerned about the car, and she was afraid that, if she brought home another damaged vehicle, her family would send her to a homeless shelter.  (*Id.* at 123-24.)  She gave Petitioner oral sex and urged him to go home and stop fighting.  (*Id.* at 124.)   Instead, Petitioner drove to a two-track road off "Egner" Road, where Petitioner ordered K. Hawkins out of the car.  They had sex on the trunk of K. Hawkins' car.  K. Hawkins testified that Petitioner did not force her out of the car or force her to take her pants off, and she did not remember telling the police that.  (*Id.* at 125-26.)  K. Hawkins testified that she wanted to have sex to stop fighting with Petitioner and to prevent anything else from happening.  (*Id.* at

126.)  The fighting did not stop, however.  K. Hawkins ended up on the ground, where Petitioner

strangled her.  (*Id.*)  K. Hawkins testified that she was unsure whether she lost consciousness.  (*Id.*

at 127.)  They eventually got back into the car and drove down the road, but they heard Petitioner's

phone ringing.  Petitioner stopped the car at Egner and 13 Mile Road to look for it, and they then

drove back to his house.  Petitioner got out of the car, and K. Hawkins drove to her own home.  (*Id.*

at 127.)

At the time of the incident in August 2006, an outstanding personal protection order

(PPO) barred Petitioner from having contact with K. Hawkins.  K. Hawkins applied for the PPO after

Petitioner assaulted her in June 2006.  (*Id.* at 129.)  K. Hawkins acknowledged that violence between

the two was an ongoing problem.  Despite the PPO, she continued to have contact with Petitioner,

visiting him, calling him and writing him letters.  (*Id.* at 129-30.)  K. Hawkins identified a letter she

wrote to Petitioner on November 16, 2006.  (*Id.* at 130-31.)  The letter was admitted over objection.

(*Id.* at 131-32.)  At that time K. Hawkins stated that she did not remember whether she had suggested

sex or whether she was raped.  (*Id.* at 132.)  K. Hawkins testified that she agreed to the sex; she did

not absolutely desire having sex, but she wanted to have sex to protect her car and to avoid being

sent to a homeless shelter.  (*Id.* at 133.)  K. Hawkins identified another letter she wrote to Petitioner

on November 28, 2006.  At that time, she told Petitioner that she felt humiliated to tell people old

enough to be her father that she had given someone a blow-job.  (*Id.* at 137.)  The letter impeached

her testimonial denials of humiliation.  The letter also stated that she had been afraid she would lose

her breast because of the injury, in contrast with her testimonial denial of such fear.  (*Id.*)  K.

Hawkins admitted that she "was pretty bruised up" and that she looked like she was attacked by a

bear.  (*Id.* at 139-40.)  K. Hawkins also identified 29 photos taken by the police of her injuries, and

she testified that the injuries depicted in the photographs were caused by Petitioner, some before and some after sex. (*Id.* at 140.)

Sherry Lynne Hawkins (S. Hawkins), K. Hawkins' mother, testified that the relationship between K. Hawkins and Petitioner had been troubled. (*Id.* at 154-55.)  In the early morning of August 25, 2006, S. Hawkins was sleeping when her daughter came home.  K. Hawkins woke her up, saying that Petitioner had tried to kill her. (*Id.* at 155.)  K. Hawkins was crying and saying that she hurt.  S. Hawkins went into the bathroom, saw that her daughter was beaten up, and said, "You have to go to the hospital." (*Id.* at 156-57.)  K. Hawkins told her mother that Petitioner tried to strangle her and that she had passed out twice. (*Id.* at 157.)  K. Hawkins also told her mother that she had to do some really degrading and humiliating things so that she could live to be with her daughter. (*Id.*)  S. Hawkins took her daughter to the hospital sometime after 1:00 a.m. (*Id.* at 158.)

Suzanne Reiter testified that she was a nurse practitioner at Planned Parenthood and sexual assault nurse examiner for the YWCA.  At 4:30 a.m. on August 25, 2006, Reiter conducted a sexual assault examination of K. Hawkins at United Memorial Hospital in Greenville. (Tr. III at 6-7.)  Reiter testified that K. Hawkins told her that the incident began at about 11:30 p.m. on August 24, 2006.  K. Hawkins told Reiter that she was at the Crazy Horse Saloon and went outside.  K. Hawkins reported that Petitioner pushed her, hit her in the face, and ripped her shirt off of her. (*Id.* at 15.)  K. Hawkins went back into the bar and called 911.  She then went back out to her car, where Petitioner eventually got control of the car and then hit her several times.  K. Hawkins stated that Petitioner made her perform fellatio while he was driving.  They eventually went somewhere in the country, where Petitioner pushed her down and choked her until she passed out.  He then told her to take off her pants and he put his penis in her vagina while she was sitting on the trunk of her car.

(*Id.* at 16.)  K. Hawkins had several contusions on her face, including over her eyes and across her nose.  As the examination proceeded, Reiter noted that bruises continued to form.  (*Id.* at 16, 18.)  An extremely dark bruise formed on her lip.  K. Hawkins had red spots on her chest, particularly her right breast, and she had cuts on the right areola, one of which was like a puncture.  She also had bruises on her back and on her neck.  (*Id.* at 17-19.)  Reiter testified that K. Hawkins made good eye contact and answered questions and showed no impairment from drinking.  (*Id.* at 21.)  Reiter did not perform an opthalmologic examination by stretching her eyes; K. Hawkins was very tender in that area.  (*Id.* at 23.)

Kelli Gibbs testified that she had been a friend of K. Hawkins for three years.  (*Id.* at 30-31.)  K. Hawkins had called her to say that there would be a comedy show at the Crazy Horse, and she asked Gibbs to go.  K. Hawkins picked up Gibbs at about 7:00 p.m. on August 24, 2006.  They went to Petitioner's house to pick him up, but Petitioner rode with Bill.  They drove to the Crazy Horse, arriving at 8:30 or 9:00 p.m.  (*Id.* at 31.)  They found a table and ordered a pitcher of beer, waiting for the comedy show to begin.  (*Id.* at 32.)  Bill bought K. Hawkins a shot of tequila, and Petitioner became irritated that another man had bought her a drink, asking for several minutes why K. Hawkins would allow that.  (*Id.*)  When the comedy show began a few minutes later, Gibbs thought everything was fine.  (*Id.* at 32-33.)  Gibbs testified that K. Hawkins and Petitioner were separated at the time.  After the comedians were finished, the four got up to leave.  They all got into Bill's car, and he was going to drive.  They got pulled over by a police officer on the highway on-ramp.  (*Id.* at 33.)  The officer eventually gave all four breathalyzer tests and told them that none of them was fit to drive.  (*Id.* at 33-34.)  Gibbs called her friend Cassie from the gas station, where the police officer had dropped them.  Cassie came and drove them all back to the Crazy Horse, and all

of them planned to go home.  (*Id.* at 34-35.)  At the Crazy Horse, Petitioner and K. Hawkins got out of the car, and Gibbs drove away with Cassie.  (*Id.* at 35.)  Gibbs assumed that K. Hawkins was going to drive Petitioner home in her car and then drive herself home.  She did not see them again that night.  (*Id.*)

John Poe testified that he was at the Crazy Horse on August 24, 2006 with his fiancee.  At about 10:30, as he was standing near his car and putting his wheelchair inside, he saw a distraught and crying woman head toward the entrance doors of the bar.  (*Id.* at 41-42, 45.)  He went up to see what was going on, and the woman said something about being unable to find her keys.  The woman went inside to use the phone.  A man was standing next to her, and Poe asked the man what was happening.  The man said, "We're arguing[.]"  Poe asked, "You didn't hit her or anything[?]"  Poe opposed such behavior, and he thought they were acting strangely.  (*Id.* at 41-42.)  The woman came back out and went to her car, a white Tempo.  The man was leaning in through the passenger door when K. Hawkins put the car in gear and drove away quickly, with the man hanging out the door.  Poe called 911, because he was afraid the man was going to fall out and get hurt.  (*Id.* at 43.)  Poe saw them drive out toward the end of the parking lot and then lost sight of them.  (*Id.*)

Kent County Sheriff Department Deputy Ronald Kimbrough testified that he was dispatched to the Crazy Horse at approximately 11:15 on August 24, 2006, after a 911 call was made and disconnected from there.  (*Id.* at 49.)  He was less than one and one-half miles from the bar, and he arrived quickly.  He arrived as the bar was closing.  He drove through the lot, but did not find any suspicious people.  (*Id.* at 50.)  He was there under five minutes before he proceeded on his usual routine.  At approximately 1:30 a.m., Montcalm County received a phone call from a woman, who they determined had suffered an incident at the Crazy Horse.  At about 2:30 a.m., Kimbrough

received a call from United Memorial Hospital, indicating that they had the woman about whom Montcalm County had received a call. He went to the hospital. (*Id.* at 51.) Kimbough met K. Hawkins at the hospital. She had already made an appointment with the YWCA in Grand Rapids to be examined at 4:00 a.m., so he interviewed her briefly. (*Id.* at 52.) Kimbrough testified that K. Hawkins looked like she had been in a fight. She had numerous red marks about her neck and swelling and darkness underneath the left eye. She also had a bump on the right forehead that looked like it was developing into a black eye. She had bruising on the bridge of her nose, and he was told of a few other injuries that he could not see. (*Id.* at 52-53.)

According to Kimbrough, K. Hawkins told him that she had gone out for the evening with her friend Kelli. They had seen a comedy show at the Crazy Horse Saloon, where they met other people they knew, including Petitioner, the father of her child, against whom she had a current PPO. (*Id.* at 53-54.) When the show ended, they attempted to go to another bar for further drinks, but they made it only a half-mile before the driver was stopped by a police officer. They were transported to a nearby gas station, after which another person took them back to the bar. Some time had passed, and K. Hawkins reported that she had no longer wanted to go out and drink and that she was intending to go home. (*Id.* at 54-55.) Petitioner wanted her to go with him and to continue partying at his house, but she did not wish to do so, so an altercation began. She got out of the car in which they were transported and began to walk toward her own car. Petitioner became irritated and began grabbing her hair, hitting her around the face and shoulders. As she was standing between the open door of the car and the vehicle, she was thrown to the ground. During the altercation, her sweatshirt, top and bra were pushed up, and she found herself sitting topless in the middle of the parking lot. (*Id.* at 55-56.) Both of her breasts were bitten while she was on the ground. She

managed to get away and to throw her keys across the parking lot so that Petitioner could not take her vehicle.  She grabbed her tank top, put it on, and ran for the bar.  (*Id.* at 56.)  She went to the pay phone in the foyer of the bar and dialed 911.  She screamed something at dispatch that they did not understand.  She then realized that Petitioner had followed her inside, and she believed that she could make it to her vehicle and escape.  (*Id.* at 56.)  She reached her vehicle, got in, and attempted to drive away, but Petitioner grabbed onto the passenger-side window, and she drove around the lot trying to get him off.  When he would not get off, she slowed down, and he climbed inside.  He began to punch her and assault her, dragged her away from the driver's seat and pushed her onto the passenger floorboard.  (*Id.* at 57.)  Petitioner took the driver's seat and threatened to rip her face off before driving away.  (*Id.* at 57-58.)  He continued to punch K. Hawkins an unknown number of times, and he demanded that she provide him oral sex.  She complied.  (*Id.* at 57.)  After the sex act was completed, K. Hawkins was able to see where they are going.  She described driving down Edgerton Road, going by the Algoma township fire barn, and crossing 13 Mile Road.  (*Id.* at 58.)  After they stopped, Petitioner forced K. Hawkins out of the passenger seat, and he followed her out the same door.  They moved toward the back of the car, where he ordered her to take off her pants.  He then vaginally raped her against the trunk of the vehicle.  (*Id.* at 59.)  After having sex with her, Petitioner twice grabbed her by the throat and choked her until she became unconscious.  When she regained consciousness, Petitioner threw her pants at her and ordered her to put them on.  (*Id.* at 59.)  He then hit and pushed her into the vehicle, causing her to hit her head.  They drove back to his address, which was located a few miles away.  When they arrived, he told her he was sorry, and she left to go to her own home.  (*Id.* at 59-60.)

Based on K. Hawkins' description, another officer tentatively identified the location. (*Id.* at 58, 60.)   At the end of the interview, Deputy Kimbrough drove K. Hawkins to her appointment at the YWCA.  On the way, they took a detour to the location found by the other officer. K. Hawkins identified the location and identified the panties found at the scene as her own.  (*Id.* at 60.)

Kent County Deputy Brian Mercer testified that he received a call from Deputy Kimbrough at approximately 3:00 a.m. on August 25, 2006.  Kimbrough asked Mercer to go to the area of Edgerton and Wolven in an attempt to locate a crime scene.  Once he got there, he went to a gravel area next to the Rogue River where people sometimes park.  He got out on foot and he could see some tire tracks and foot tracks in the parking area.  He saw a pair of red women's underwear off to the side.  (*Id.* at 66-67.)  He did not touch anything; he simply waiting until Deputy Kimbrough arrived.  (*Id.* at 68.)

During the morning recess, counsel for Petitioner indicated that, although he had advised to the contrary, Petitioner intended to take the stand in his own defense.  (*Id.* at 70.)  The court advised Petitioner of his right not to testify, and Petitioner expressed his understanding.  (*Id.* at 70-72.)  Petitioner then requested that counsel be withdrawn and that he be given an opportunity to retain a lawyer.  (*Id.* at 72.)  Petitioner asserted that he had not been informed of a plea offer, and he expressed his dissatisfaction with counsel's refusal to ask certain questions Petitioner proposed. (*Id.* at 73-74.)  The court denied Petitioner's request to grant a continuance in the middle of a trial so that Petitioner could attempt to retain an attorney, for which he had failed to demonstrate an ability to pay.  (*Id.* at 76.)

Jennifer Markum, the executive director of Safe Haven Ministries, was qualified as an expert in the field of domestic violence. (*Id.* at 78, 81.) Markum testified about the types of power and control exercised over victims of domestic violence to ensure that they do what the abuser wants. She indicated that frequently the victim is placed in fear that something is going to happen to her, to her children, or to her family members, if the victim does not do exactly what the abuser asks her to do. (*Id.* at 84.) Because of this fear and because they do not trust the system, victims often recant their reports of abuse. (*Id.* at 85.) In addition, the cycle of violence includes several phases: a tension-building phase in which the victim "walk[s] on eggshells"; an explosive episode; followed by a period in which the abuser acts loving, expresses remorse and makes promises that the behavior will not be repeated. (*Id.*) Most abused women who come to Safe Haven do not hate – in fact frequently love – their abusers. They want to end the abuse, but not necessarily the relationship. (*Id.* at 85-86.)

Kent County Detective Jason Van Dyke testified that he interviewed K. Hawkins at approximately 5:00 p.m. on August 25, 2006, after she had been examined at the YWCA. Van Dyke authorized the taking of photographs of K. Hawkins' injuries. (*Id.* at 90-91.)

The prosecution rested, and defense counsel advised the court that the defense would present no witnesses. The court recessed for the day. (*Id.* at 92-93.) After the jury left the courtroom, the parties made a record of the plea offers made by the prosecution and the transmittal of those offers by defense counsel. (*Id.* at 74.) The prosecutor had initially offered Petitioner the opportunity to plead to one count of third-degree CSC, predicting a sentencing-guideline range of 36 to 60 months. (*Id.* at 95.) The offer was open until the morning trial began. The prosecutor had indicated a guideline range of 51 to 85 months on the CSC I charge. (*Id.* at 96.) Petitioner

- 14 -

complained that he did not have the guideline information until a few days before trial.  (*Id.*)  During

the break, Petitioner expressed his willingness to accept the earlier plea offer, but the offer was no

longer open after the trial began and the charge of GBH had been added.  (*Id.* at 96-97.)

At the conclusion of trial, on April 26, 2007, the jury found Petitioner guilty of two

counts of CSC I and one count of GBH.  (Tr. IV, 89-94.)  On June 4, 2007, Petitioner was sentenced

to a prison term of five to ten years on the GBH conviction and twelve to twenty-five years on each

of the CSC I convictions.  (Sentencing Transcript, (S. Tr.) at 11-12, docket #15.)

### B.   Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on October 6, 1995, raised the first two issues presented in this application for

habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #16.)   Petitioner filed a pro per

supplemental brief on appeal, raising the three remaining arguments presented in his habeas petition.

(*See* Def.-Appellant's Supp. Br. on Appeal, docket #16.)   By unpublished opinion issued on

November 20, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed

Petitioner's convictions and sentences.  (*See* 11/20/08 Mich. Ct. App. Opinion (MCOA Op.),

docket #16.) Petitioner sought reconsideration, which the court denied on December 30, 2008. (*See*

12/30/08 Mich. Ct. App. Order (MCOA Ord.), docket #16.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the same five claims presented to and rejected by the Michigan Court of

Appeals.  By order entered May 27, 2009, the Michigan Supreme Court denied his application for

leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See*

5//27/09 Mich. Sup. Ct. Order (Mich. Ord.), docket #17.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

at 655.  In determining whether federal law is clearly established, the Court may not consider the

decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655;

*Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Moreover, "clearly established Federal law"

does not include decisions of the Supreme Court announced after the last adjudication of the merits

in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination

of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme

Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).   The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case."  *Id.*  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.  "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan

appellate court is considered a decision on the merits entitled to AEDPA deference).  The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances

indicate that the state court has not addressed the merits of a claim, the court conducts *de novo*

review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based

on a state standard different from the federal standard, the presumption arguably might be

overcome); *see also Harrington*, 131 S. Ct. at 785 (noting that the presumption that the state-court's

decision was on the merits "may be overcome when there is reason to think some other explanation

for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing

habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*,

160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.

2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v.

Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA,

the Court concludes that Petitioner is not entitled to relief.

### Discussion

I.     Ground I:  Addition of Charge of GBH

In his first ground for habeas relief, Petitioner contends that the prosecutor improperly

added the charge of GBH on the morning of trial.  Petitioner argues that, by adding the count at that

late date, he was denied his rights under the Sixth Amendment and the Michigan Constitution to fair

notice of the charges against him.  In addition, Petitioner claims that he had a right under state statute to a preliminary examination.

To the extent that Petitioner argues that he was entitled under a Michigan statute or the Michigan constitution to a preliminary examination on the amended information, he fails to raise a claim cognizable in a habeas proceeding.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

In addition, the sufficiency of a state charging information is generally not a proper subject for habeas corpus review.  *Knewel v. Egan*, 268 U.S. 442, 446 (1925).  "The due process clause of the Fourteenth Amendment mandates [only] that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense."  *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984)).  A complaint or indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th

Cir. 1986).  Thus, when reviewing amendments to state charging documents in habeas corpus proceedings, the federal courts focus on the questions whether the defendant was surprised by the amendment or otherwise prejudiced in his ability to defend himself at trial.  *See Rhea v. Jones*, 622 F. Supp. 2d 562, 583 (W.D. Mich. 2008); *see also Tague v. Richards*, 3 F.3d 1133, 1141-42 (7th Cir. 1993) (finding that amendment to information on the date of trial to include the words "and/or sexual intercourse" to information charging petitioner with engaging in sexual[lly] devia[nt] conduct with a minor was not a due process violation because petitioner was aware "right from the start" that the victim alleged that he had tried to have sexual intercourse with her and because petitioner failed to demonstrate "how his defense would have differed had the information been amended earlier."); *Johnson v. Mackie*, No. 11-cv-13364, 2014 WL 1418678, at *7 (E.D. Mich. Apr. 14, 2014) (finding that "amendment from open murder (which encompasses first-degree and second-degree murder) to first-degree murder two months before trial did not alter the crime charged nor unfairly surprise Petitioner").

   In the instant case, Petitioner was not surprised by the amendment to the information. According to the opinion of the Michigan Court of Appeals, the prosecutor informed Petitioner's original attorney on January 12, 2007, more than three months before the start of trial, that an additional charge of GBH would be added if the complaining witness persisted in recanting her evidence and if Petitioner did not accept the plea offer.  (MCOA Op. at 2.)  On March 27, 2007, the prosecutor sent notice of the added charge to Petitioner's defense attorney, and the matter apparently was discussed at a pretrial hearing during which defense counsel acknowledged receiving a faxed copy of the amended information on April 16, 2007, nearly a week before trial.  Thus, as early as

several months before trial, Petitioner was well aware that the prosecutor intended to add the charge of GBH at trial. (*Id.*)

As discussed, the factual findings made by the state courts, including the court of appeals, are entitled to a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Sumner*, 449 U.S. at 546. Petitioner suggests that he understood that the charge of GBH was merely an alternative charge, which would be imposed only if the jury acquitted him of CSC I. The argument, however, is directly at odds with the record. On the first day of trial, defense counsel admitted that, prior to trial, he had received notice "that an *additional* charge of assault with intent to do great bodily harm was added to the information." (Tr. I at 9.) Both the trial court and the prosecutor expressly discussed the fact that the charge of GBH could not be used as a lesser included offense, but needed to be charged as an additional offense. (*Id.* at 10.) Petitioner provides no conflicting factual evidence. As a consequence, he fails to demonstrate that the state-court's decision was based on an unreasonable interpretation of the facts or was contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

II.     Count II:  Inaccurate and Prejudicial Jury Instructions

In his second ground for habeas relief, Petitioner contends that the trial court provided extensive, extemporaneous jury instructions that were prejudicial. He argues that the court's instructions on consent undermined the defense and suggested that the court had determined Petitioner to be guilty.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire

- 21 -

trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

The Michigan Court of Appeals exhaustively analyzed the issue as follows:

Defendant next asserts that the trial court's initial instruction to the jury before presentation of the proofs that, "sexual assaults really aren't sexual crimes. They're crimes that are outrageous and violent," minimized the sexual penetration element of the crime. Defendant's unpreserved claim is reviewed for plain error. *People v Cornell*, 466 Mich 335, 363 n 16; 646 NW2d 127 (2002), overruled on other grounds in *People v Mendoza*, 468 Mich 527, 533; 664 NW2d 685 (2003).

We find that the challenged, extraneous remark by the trial court merely explained to the jury that there is no requirement that the charged offense be sexual in the normal sense, i.e., sexually gratifying or involving orgasm. Rather, the focus in establishing the elements of this offense is on the parts of the body involved and the use of force or coercion. The comment, even if unnecessary and somewhat confusing, did not shift the focus to the force or coercion element of the offense and minimize the sexual penetration element. The trial court never stated that a showing of penetration was not required. In fact, the trial court repeatedly instructed the jury on the elements of first-degree criminal sexual conduct and defined sexual penetration under the statute. Consequently, defendant has failed to show the existence of a plain error affecting his substantial rights. *Carines*, supra at 763-764.

Defendant further argues that the trial court's final instructions to the jury favored the prosecution's theory of the case and effectively removed from the jury's consideration the defense of consent and the element of force or coercion. Because defendant objected to the trial court's instructions, this preserved constitutional claim is reviewed under the harmless error standard. *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000). This Court must determine whether any error exists and, if so, whether it was harmless beyond a reasonable doubt. *People v Anderson (After Remand)*, 446 Mich 392, 405-406; 521 NW2d 538 (1994). The trial court instructed the jury on all of the relevant elements of first-degree criminal sexual conduct, explained the examples of force or coercion that are provided in the statute, noting

they did not comprise an exhaustive list, and discussed the defense of consent.  The trial court further instructed that "the words 'used to accomplish' have a much broader meaning" than provided in the statute.  Within the instructions, the trial court reiterated that consent is a defense, "but only if the consent was freely given, not given out of fear that something was going to happen to that person then or in the near future or something was going to happen to something else."  Consent "induced by fear generated by the person with whom sexual penetration occurs" is not "genuinely free" and consent "has to be genuinely free."  "If it is genuinely free, it's an absolute defense."  For example, consent is not valid where "a victim says later on that he or she consented.  Obviously what they say later on is a factor to be used to decide whether they consented back at the time the incident happened, but it's consent when it happened, not people's perceptions of it later."  Additionally, the trial court explained that the jury verdict form contained three alternatives, which included: "induced submission by physical violence," "induced submission by verbal threats," and "taking advantage of or exploiting the fact that the person was fearful of significant harm."  The trial court reiterated that "if you don't find any of them, then we can't even have criminal sexual conduct, period."

The trial court's instructions, although extensive and repetitive, presented all of the elements of the charged offenses and the defense of consent. *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000).  Consent involves a willingly engaged in act that is not the product of coercion.  *People v Khan*, 80 Mich App 605, 619 n 5; 264 NW2d 360 (1978).  The model jury instruction, CJI2d 20.27, explains that the defense of consent, in part, is where "[a] person consents to a sexual act by agreeing to it freely and willingly, without being forced or coerced."  The trial court explained that consent must be freely given.  In addition, force and coercion in MCL 750.520b are not limited to "raw physical force or threats of physical violence." *People v Reid*, 233 Mich App 457, 469 n 5; 592 NW2d 767 (1999).  Coercion may also be "implied, legal or constructive, as where one party is constrained by subjugation to another to do what his free will would refuse."  Id. at 469, quoting *People v Premo*, 213 Mich App 406, 411; 540 NW2d 715 (1995).  Coercion may "extend[] far beyond the direct use of raw physical force or threats of physical violence."  *Reid, supra* at 469 n 5.  The trial court's statements that the sexual penetration could be accomplished by circumstances that were similar to using physical force and coercion, such as "taking advantage of or exploiting the fact that the person was fearful of significant harm," is consistent with the definitions of coercion and force under MCL 750.520b.

Although a trial court commits error requiring reversal when it instructs the jury that an element of an offense is established as a matter of law, *People v Reed*, 393 Mich 342, 349; 224 NW2d 867 (1975), we conclude that the trial court's instructions in this case did not cross this boundary.  While the trial court may have overstated its instructions in not merely defining consent, but in further explaining

that "freely given" consent does not include circumstances where the victim later changes her mind and claims she consented, or forgives the defendant after the fact and no longer wishes to pursue charges, the trial court never stated that an element of the offense was established as a matter of law, or that defendant's defense was precluded as a matter of law.  See *People v Gaydosh*, 203 Mich App 235, 236-237; 512 NW2d 65 (1994).   The jury remained free to decide whether the victim's consent, at the time of the incident, was freely given.  Further, the trial court's use of examples of force or coercion did not specifically include the exact same factual scenario involved in this case.  See *People v Edwards*, 206 Mich App 694, 696-697; 522 NW2d 727 (1994).  Viewed in their entirety, the trial court's instructions did not provide an erroneous definition of consent or impermissibly remove an element of the charged offenses from the jury's consideration.  Therefore, the record does not support defendant's claim of error.  *Duncan, supra* at 51.

(MCOA Op. at 2-4.)

It is apparent from the analysis of the court of appeals that the jury instructions did not undermine the fundamental fairness of Petitioner's trial.  Indeed, the court of appeals concluded that the jury instructions delivered by the trial court properly outlined the elements of the offense under state law.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).  Because the trial court did not misstate the requirements of proving consent, the court's instructions, at most, were repetitive, not erroneous.  In these circumstances, the jury instructions were not even wrong; they therefore did not and could not infuse the trial with unfairness so as to implicate due process.

### III.    Ground III:  Sufficiency of the Evidence

In his third habeas ground, Petitioner argues that the prosecutor presented insufficient evidence to prove CSC I, because the prosecution failed to establish the element of force or coercion. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the

Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The state court carefully analyzed the issue:

Defendant also argues that there was insufficient evidence regarding the element of force or coercion to sustain his first-degree criminal sexual conduct convictions. We review the evidence de novo, in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe*, 440

Mich 508, 515-516; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Due process requires that the prosecution introduce sufficient evidence to justify a jury's decision that the defendant is guilty beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 722-723; 597 NW2d 73 (1999).

We find that there was sufficient evidence presented to enable a rational trier of fact to conclude, beyond a reasonable doubt, that defendant "engaged in sexual penetration" with the victim, causing her personal injury, and used force or coercion to accomplish the sexual penetration. *People v Petrella*, 424 Mich 221, 238-239; 380 NW2d 11 (1985); MCL 750.520b(1)(f). Viewing the evidence in the light most favorable to the prosecution, the record shows that defendant repeatedly hit, beat, and choked the victim. The victim sustained extensive injuries; and claimed, initially, that she was afraid for her life and forced to engage in both acts of penetration.

We resolve the victim's conflicting testimony and statements to the police and medical examiners in favor of the prosecution. *People v Fletcher*, 260 Mich App 531, 562; 679 NW2d 127 (2004). The jury chose not to believe the victim's trial testimony that she consented to sexual intercourse with defendant, and instead found more credible the version of events she related to the authorities and her mother on the night of the incident. It is solely within the jury's purview to determine what weight and credibility to give the evidence. *Wolfe, supra* at 514-515, quoting *People v Palmer*, 392 Mich 370, 375-376; 220 NW2d 393 (1974). Defendant's contention regarding the victim's credibility in light of her alleged intoxication and conflicting testimony is also unavailing.

(MCOA Op. at 4.) Although the court of appeals did not expressly cite to federal cases, it recited state precedent applying the *Jackson* standard. *See, e.g., Johnson*, 597 N.W.2d at 75 (citing *Jackson*, 443 U.S. 307); *Wolfe*, 489 N.W.2d at 751 (same).

Petitioner points to a variety of factors casting doubt on the credibility of the earlier victim statements. He argues that, because the complainant testified at trial that she initiated the sexual conduct, her prior statements should not be believed. He also argues that she was under the influence of alcohol, so her contemporaneous statements were not reliable. Further, he asserts that the victim's prior statements must be disbelieved in their entirety because both the victim and Gibbs testified that they met Petitioner at his house before going to the Crazy Horse, contrary to the history

- 26 -

reported in the statements.  Finally, he argues that there could not have been force used because the victim did not have any vaginal injuries.  For all these reasons and in light of the victim's trial testimony, he argues, the jury lacked sufficient evidence to prove that Petitioner had used force or coercion to commit a sexual assault.

Despite the complainant's efforts to minimize the events, multiple witnesses testified regarding the detailed statements she made at the time of the incident.  In addition, the complainant suffered significant injuries during the course of events, and the complainant's own description of consent was qualified, indicating that she consented only to stop the fight.  To the extent that the victim's evidence varied over time, the credibility of her testimony and the testimony of others was solely for the jury to determine.  *See Herrera*, 506 U.S. at 401-02.  Given the facts presented at trial, the jury possessed ample evidence upon which to convict Petitioner of using force or coercion in committing the sexual assault.  Especially in light of the deference owed to both the state-court decision and the jury, *Davis*, 658 F.3d at 531, Petitioner is not entitled to relief on his third habeas ground.

IV.    Ineffective Assistance of Trial Counsel

Petitioner next contends that he was denied the effective assistance of trial counsel. Citing counsel's motion to adjourn trial after losing his motion to preclude the expert witness, Petitioner asserts that his attorney had insufficient time to prepare for trial.  Petitioner also argues that trial counsel was ineffective in failing to call Renae Heiss or Racheal Kreplick to testify that it was common for Petitioner and the complainant to fight and have sex in the same day. He also argues that his attorney did not attempt to present evidence that Petitioner was trying to get custody

of LaChante Heiss, his daughter with the complainant, which would have provided evidence of the complainant's motive to lie.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).

In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

Applying the *Strickland* standard, the Michigan Court of Appeals rejected Petitioner's claim on appeal.

> Defendant next asserts that he was denied the effective assistance of counsel because defense counsel lacked sufficient time to prepare his case, only visited defendant six days before trial, and failed to present specific evidence and witnesses. Review of defendant's unpreserved claim is limited to errors apparent on the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). Defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness given prevailing professional norms, and that there is a reasonable probability that the outcome of the trial would have been different absent counsel's error, and the result was fundamentally unfair or unreliable. *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007). Defense counsel's performance is presumed effective and to constitute sound trial strategy. *Id.*

> The record shows that defense counsel moved to adjourn the trial not because he required additional time or was unprepared, but because he sought to have the trial court either exclude the prosecution's expert testimony or allow him additional time to retain a rebuttal expert. While defense counsel's motion was denied, the record does not support an assertion that his actions were in any way deficient. *Odom, supra* at 415. Contrary to defendant's claim, his counsel's objection assisted defendant, because the trial court ultimately decided to limit the expert's testimony. Defendant fails to specify how the outcome of the trial would have been different had counsel obtained an adjournment. Defendant has also failed to provide factual support for his assertion that defense counsel only visited him six days before trial began. Consequently, defendant has not met his burden of demonstrating ineffective assistance of counsel. *Id.*

> Defendant next asserts that his appointed counsel's performance was deficient because he did not call the witnesses defendant requested and did not pose the questions that defendant desired. Defense counsel is afforded deference regarding matters of trial strategy. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308

(2004). Failing to call a witness will only constitute ineffective assistance where it deprives defendant of a substantial defense. *Id.* We find that defense counsel's decision not to call Renae Heiss or Rachael Kreplick to testify constituted sound trial strategy and did not deprive defendant of a substantial defense. Defense counsel repeatedly presented defendant's theory that the victim consented to, and even suggested, both acts of sexual penetration, and provided several explanations for the victim's recantation. The victim testified favorably for defendant, supporting his theory and claiming that she consented to sexual intercourse. Because Renae's testimony would have been cumulative to the victim's testimony, defense counsel did not deprive defendant of a substantial defense by failing to call her as a witness. *Dixon, supra* at 398. Kreplick's testimony was irrelevant to defendant's theory at trial that the victim consented to the sexual penetration. Thus, defense counsel's decision not to call Kreplick did not deprive defendant of a substantial defense and should be afforded deference as a matter of trial strategy. *Id.* Defense counsel's decision not to introduce certain evidence regarding the victim's motives to concoct a rape allegation, for which defendant has failed to provide factual support, also deserves deference as a reasonable strategic decision. *Id.*

(MCOA Op. at 4-5.)

The court of appeals' decision was patently reasonable both factually and legally. Neither in the state courts nor in this Court has Petitioner disputed the state court's factual determination that counsel's pretrial motion seeking a continuance was based on a belated determination that, potentially, a competing expert might be found. Petitioner has never identified such an expert, nor has he suggested what the unidentified expert might have contested. Indeed, because the trial court limited the expert's testimony strictly to helping the jury to understand why a victim of abuse might change her story, not to any opinion about the history of the complainant in this case (*see* Tr. I at 5-8), it is not at all clear what any rebuttal witness might have added. In sum, Petitioner offers nothing that would overcome the presumption of correctness that attaches to the state court's factual determination. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546.

Moreover, the record contains no indication that defense counsel was unprepared for trial. Counsel filed and contested motions, proffered objections, vigorously cross-examined

witnesses and pursued a consistent and plausible theory of the case throughout trial.  The court of appeals therefore reasonably determined that counsel was fully prepared for trial.

Petitioner next argues that his attorney rendered ineffective assistance when he failed to present witnesses that would have assisted the defense.  Petitioner argues that counsel should have called Renae Heiss and Rachael Kreplick, who would have testified that Petitioner and the complainant were involved with one another, that the violence between them was mutual and that it was common for the two to fight and have sex in the same day.  As the state court indicated, the complainant herself testified that she and Petitioner had both been violent during their relationship and that she had initiated the sexual contacts on August 24, 2006.  Accordingly, the testimony of both Renae Heiss and Rachael Kreplick would have been either irrelevant or cumulative.  In these circumstances, the state court properly concluded that Petitioner had failed to overcome the presumption that trial counsel's decision not to call Renae Heiss and Rachael Kreplick was a matter of trial strategy.  For the same reasons, Petitioner cannot demonstrate that the absence of the witnesses' testimony prejudiced his case.

In his final argument, Petitioner suggests that the complainant's motive to lie could have been impeached by evidence that Petitioner had told the complainant that he intended to seek custody of their minor child.  As previously discussed, however, the victim testified favorably for Petitioner.  Moreover, even if Petitioner's prior threat were admissible evidence, its exclusion could not have prejudiced his case.  The victim herself impeached her earlier statements, undermining their truthfulness far better than any possible motive she might have had to lie.  In fact, given that Petitioner at no time suggests that he had actually attempted to obtain custody, his simple statement of intent has little evidentiary value of any motive possessed by the victim.  The state court

- 31 -

reasonably determined that Petitioner had failed to demonstrate that counsel was ineffective in failing to impeach the victim with his prior statement.

In sum, Petitioner wholly fails to overcome the double deference owed to the state court's decision rejecting his claims of ineffective assistance of counsel. *See Harrington*, 131 S. Ct. at 788.

## V.     Prosecutorial Misconduct

In his final ground for habeas relief, Petitioner argues that the prosecutor committed misconduct by arguing facts not in evidence during the opening statement. Specifically, he argues, the prosecutor told that jury that the complainant would testify and would lie to assist Petitioner. He also contends that the prosecutor introduced the complainant's prior statements into evidence.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See*

*id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

       The Michigan Court of Appeals weighed the prosecutor's remark under the circumstances of the trial, the absence of objection, and the instructions given to the jury, as directed by established Supreme Court precedent.  The court concluded that the prosecutor had not made an improper comment:

> Defendant next argues that the prosecutor engaged in misconduct during his opening statement when he told the jury that the victim was going to lie to assist defendant.  "The purpose of an opening statement is to tell the jury what the advocate proposes to show." *People v Moss*, 70 Mich App 18, 32; 245 NW2d 389 (1976). The record reflects that the prosecution's statements were ultimately supported by the evidence admitted at trial.  *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). The prosecutor did not blatantly call the victim a liar or attempt to inflame the jury's prejudices, and was not required to phrase his statements in the blandest possible terms.  *Moss, supra* at 32.  In addition, the trial court instructed the jury that the lawyer's statements were not evidence, curing any potential prejudice.  *Unger, supra* at 234-235.
>
> Defendant's argument that the prosecution failed to lay a proper foundation for introduction of letters that the victim wrote to defendant is also unavailing.  "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007).  The prosecution laid a proper foundation by asking the victim to identify the letters.  The prosecution's questioning properly authenticated the letters pursuant to MRE 901(b)(1), through testimony of a witness with personal knowledge.  As a result, defendant's contention that defense counsel's performance was deficient because he failed to object to the prosecution's alleged misconduct is unavailing because the prosecution's actions were proper and any objection by defense counsel would have been futile.  *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

(MCOA Op. at 5-6.)

       The state court's determinations were neither contrary to nor an unreasonable application of established Supreme Court precedent.  As the court held, the prosecutor at no time

called the complainant a liar.  Instead, he described the evidence he expected to show the jury,

including what he expected the complainant to say:

> One of the things you're going to hear is Kristee still loves him, still wants to be with him.  She's going to say now she wasn't raped.  Oh, yeah, she'll admit she was beaten up, she was beat about the face and he did the fishhook and certain things, but somehow it was her idea now to have sex.

> And even that's a little bit different, because you're to hear that on one occasion she said they had the sex when they made up after the fight; on another occasion, she said that they decided – she decided to suggest sex to stop them from fighting.

> And as the judge said when you're talking about predictions, I really don't know what she's going to say here.  I don't know what she's going to say on the stand, other than she's going to say now that she wasn't raped.

> She wants to be with him.  She's in love.  She's got a fantasy of the white picket fence and raising her daughter and having more kids with him.

> And you're going to hear one final piece of evidence regarding that issue.  Jennifer Marcum is the director of Safe Haven Ministries.  She works with victims of domestic violence.  She has a long history of operating a shelter for victims of domestic violence.  And she's going to tell you in situations like this, women recanting, kind of saying – well, minimizing, changing their story because they're in love with them again is something that happens, talking about the circle of violence, and that's part of it.  It's not uncommon for someone to change their story the way Kristee is going to.

> I started this with time heals all wounds.  When you listen to this and hear all the evidence, time has healed all the wounds, the physical as well as the mental.  Kristee Hawkins had decided, I think the evidence is going to show, she's going to minimize, she's going to put off, she's going to try and forget about the terror that happened that night.

> But when you look at the evidence in terms of photos and when you look at what she told the doctors, when you look at all the evidence, what it's going to show at the close of our time together is that this man raped her.  This man forced her to put his penis in her mouth.  He forced himself on her by putting his penis in her vagina.  He caused numerous injuries in the course of this attack.

- 34 -

> It was not a bear attack, but it was an attack by her boyfriend, and he is guilty
> of the crime of criminal sexual conduct in the first degree twice.

(Tr. II at 66-67.)

As the court of appeals held, the prosecutor's summary of what he expected the evidence to be ultimately was supported by the evidence produced at trial, and the jury was properly instructed on the evidentiary value of attorney remarks.  Immediately before the parties delivered their opening statements, the trial court warned the jury that the opening statements of the attorneys would be mere predictions of what they thought would happen at trial and that the jury should expect those statements to differ.  (Tr. II at 26-27.)  In addition, the trial court repeatedly instructed the jury, the prosecutor's remarks were not evidence.  (Tr. II at 28; Tr. IV at 38.)  Further, the prosecutor's remarks were neither inflammatory nor derogatory.  In these circumstances, the state court properly concluded that the prosecutor's remarks were consistent with due process.

Moreover, to the extent that Petitioner complains that the prosecutor failed to lay a proper foundation for certain of the victim's prior statements, he fails to raise a meritorious federal claim.  A petitioner cannot demonstrate that the prosecutor committed misconduct by offering evidence that ultimately was admitted at trial.  "'A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings.'"  *See Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 1999) (quoting *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008)).  Because the statements were admitted by the court, the prosecutor cannot be said to have committed misconduct by introducing them.

## **Conclusion**

In light of the foregoing, the Court will deny the petition because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).   The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.   Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated: <u>March 5, 2015</u>                            <u>/s/ Robert Holmes Bell</u>
                                                    ROBERT HOLMES BELL
                                                    UNITED STATES DISTRICT JUDGE